UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LAURIE LATRAGNA,                          )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )        No.  4:14 CV 496 JMB
                                          )
CAROLYN W. COLVIN,                        )
Acting Commissioner of Social Security,   )
                                          )
                    Defendant.            )

### MEMORANDUM AND ORDER

This action is before the Court, pursuant to the Social Security Act ("the Act"), 42 U.S.C.

§§ 401, *et seq.*, authorizing judicial review of the final decision of the Commissioner of Social

Security (the "Commissioner") denying Plaintiff Laurie Latragna's application for Supplemental

Security Income ("SSI").  All matters are pending before the undersigned United States

Magistrate Judge with consent of the parties, pursuant to 28 U.S.C. § 636(c).  The matter is fully

briefed, and for the reasons discussed below, the Commissioner's decision is affirmed.

## I.      Procedural History & Summary of Memorandum Decision

Plaintiff filed applications for disability insurance benefits ("DIB") and supplemental

security ("SSI") income in March 2009.  With those applications, Plaintiff alleged a disability

onset date of August 8, 2008.  On September 14, 2010, those applications were denied at the

hearing level by an Administrative Law Judge ("ALJ").  (Tr. 63-79)[1]  Plaintiff filed another

application for SSI benefits in February 2011, alleging disability beginning on September 10,

2010.  That application was also denied at the initial level, and by a different ALJ at the hearing

---

[1] References to "Tr." are to the administrative record filed by the Commissioner in this matter.

level.  (Tr. 38)  The Social Security Administration Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner in this matter. Accordingly, Plaintiff has exhausted her administrative remedies and the matter is properly before this Court.  Unless otherwise noted, all references to the ALJ or hearing refer to the administrative hearing associated with Plaintiff's February 2011 application for SSI benefits.

The ALJ concluded that Plaintiff could not return to her past relevant work as a nurse. Based on hypothetical questions posed to a vocational expert ("VE"), the ALJ found that Plaintiff was not under a disability within the meaning of the Act because she could perform other work that existed in substantial numbers in the national economy, namely dining room attendant (DOT No. 311.677-010) and light janitorial (DOT No. 323.687-014).  (Tr. 54)

In her initial brief to this Court, Plaintiff argued that:  (1) the ALJ's RFC was not supported by substantial evidence and was incomplete because it failed to correspond to any medical opinion in the record (ECF No. 16 at 9); (2) the RFC determination was faulty because the ALJ failed to properly weigh the medical opinion evidence (Id. at 12); and (3) the ALJ failed to consider Plaintiff's chronic mental illness.  (Id. at 14)  The Commissioner filed a detailed brief in opposition.  (ECF No. 23)

In her reply brief, Plaintiff raised an arguably new issue relating to the sufficiency of the VE's testimony, which the ALJ relied on at step five.  (ECF No. 24)  Because the new issue involved the interpretation of an Eighth Circuit decision which was issued after Plaintiff filed her opining brief herein (see Moore v. Colvin, 769 F.3d 987 (8th Cir. 2014)), the Court issued a show cause order, allowing the Commissioner an opportunity to respond to Plaintiff's new issue. The Court allowed Plaintiff to reply to the Commissioner's response.

As explained below, the Court concludes that the ALJ did not err in determining

Plaintiff's RFC. Likewise, the ALJ properly considered the relevant opinion evidence in the record and appropriately considered Plaintiff's alleged chronic mental health conditions.

Plaintiff's contention that a conflict regarding the VE's testimony undermines the ALJ's decision presents a closer question. Although there is a conflict between aspects of the VE's testimony and the Dictionary of Occupational Titles ("DOT"), that conflict is harmless when viewed in context of the entirety of the VE's testimony and the record as a whole.

## II.     **Plaintiff's Disability and Function Reports**

In her "Disability Report – Adult," Plaintiff indicated that she can speak and understand English, read and understand English, and write more than her name in English. (Tr. 170) When asked to list all of the physical or mental conditions that limit her ability to work, Plaintiff listed "Graves disease and heart valve," and "depression." (Tr. 171) Plaintiff indicated that she last worked in December 2004. (Id.) Prior to that time, Plaintiff had worked as a full-time nurse for more than ten years. (Tr. 172) Plaintiff also provided a listing of medications she was taking, which included eye drops and medication for depression.

Plaintiff also completed a "Function Report – Adult." (Tr. 178-94) In that report, Plaintiff provided a lengthy description of her daily activities, her abilities and limitations, and other information. Plaintiff indicated that her eyes cross and she sees double, and that she was also photophobic (light sensitivity). (Tr. 183) Plaintiff reported that she forgets instructions if not written down, but also claimed that she was unable to read those instructions. (Tr. 185) Plaintiff claimed that she was not able to drive due to her photophobia and double vision. (Tr. 193) Plaintiff listed a variety of ways in which depression affects her. (Tr. 191)

Plaintiff's daughter completed a "Function Report – Third Party." (Tr. 195-203) That report included many of the same limitations and medical issues that Plaintiff had identified in

her function report.  According to her daughter, Plaintiff's hobby was to watch television and movies every day.  (Tr. 199)

III.    **Medical Records**

The administrative record includes extensive medical records.  The Court has reviewed the entire record.  The following is a summary of pertinent portions of the medical records relevant to the matters at issue in this case.

A.    **Psychiatric & Mental Health Treatment and Evaluations**

The administrative record before this Court indicates that Plaintiff has seen a number of health care professionals regarding her psychiatric condition.  While the diagnoses and impressions of the professionals vary, all agree that Plaintiff suffers from some form of mental illness.  In her visits with the mental health professionals, Plaintiff consistently referred to an incident in 2002, when some of her co-workers reportedly assaulted her and caused her to suffer a miscarriage.  According to Plaintiff, she reported a medication mistake of a co-worker, and, as a result, several African American women, including her boss, punched and kicked her.  The details of this incident are not entirely consistent between the reports of the various providers.  (Tr. at 293, 403)  For example, in one of her reports, Plaintiff claims she tried to go to a hospital after the incident but the hospital would not allow her in.   (Tr. 234-35)  In a later report, Plaintiff told her physician that she did not seek medical treatment.  (Tr. 403)

1.    **John Rudersdorf, M.D. – Barnes-Jewish Hospital**

In December 2010, Plaintiff was seen for a routine outpatient visit by Dr. John Rudersdorf, M.D., at Barnes Jewish Hospital, Outpatient Psychiatric Clinic.  (Tr. 233-38)  On Axis I, Dr. Rudersdorf assessed Plaintiff with a mood disorder, not otherwise specified,

posttraumatic stress disorder, and rule out major depressive disorder.[2]  One of the issues Plaintiff

discussed with Dr. Rudersdorf was that "she was all set for Social Security, and then tragedy

happened…. [A]fter that she … became so depressed and anxious that her daughter quit her job

to take care of her."  (Tr. 234)  Plaintiff explained the "tragedy" to Dr. Rudersdorf.  Plaintiff

stated that another doctor "screwed" her when they "filled out emergency room Social Security

paperwork…."  (Id.)  Plaintiff "continue[d] to talk about her need for disability and ask[ed] [Dr.

Rudersdorf] when [he could] fill out the paperwork."  (Tr. 234, 237)  Dr. Rudersdorf noted that

Plaintiff's records indicated a 2005 suicide attempt in which Plaintiff laid down in traffic.

Plaintiff denied that this attempt actually occurred.  (Id.)

 Dr. Rudersdorf saw Plaintiff again on January 31, 2011.  (Tr. 239-41)  Dr. Rudersdorf

observed that Plaintiff's mood was better, and that she was "significantly less tearful and

despairing" than her prior visit.  (Tr. 239)  Plaintiff reported she had an improved in a number of

categories, including her mood, energy, focus, and concentration.  (Tr. 240)  Dr. Rudersdorf

concluded that Plaintiff's progress was good and that she was "stable for outpatient

management."  (Tr. 241)

## 2. Dr. Alan Aram, Psy. D. – Psychiatric Review Technique

 On June 15, 2011, Dr. Alan Aram, Psy. D., completed a Psychiatric Review Technique in

checklist form.  (Tr. 281-92)  Dr. Aram's assessment purportedly covered the period from

September 15, 2010, to June 15, 2011. (Tr. 281)  Dr. Aram's form appears incomplete.  For

example, Dr. Aram checked a box marked "Depressive syndrome characterized by at least four

of the following" symptoms, but he did not check any box for any of the listed symptoms.  (Tr.

---

[2] "'Rule out' in a medical record means that the disorder is suspected, but not confirmed … more
information is needed to rule it out." Byes v. Astrue, 687 F.3d 913, 916 n.3 (8th Cir. 2012)
(citing United States v. Grape, 549 F.3d 591, 593 n.2 (3d Cir. 2008)).

283)  As for functional limitations, Dr. Aram indicated that Plaintiff had no limitations

regarding:  activities of daily living; maintaining concentration, persistence, or pace; and

episodes of decompensation of extended duration.  (Tr. 289)  Dr. Aram found Plaintiff to have

mild difficulties in maintaining social functioning.  (Id.)  Among his notes, Dr. Aram reported

that Plaintiff was "OK with written directions," but forgot spoken directions if not written down.

(Tr. 291)

### 3.     Dr. John Rabun, M.D. – West Park Medical Clinic

On June 6, 2011, Dr. John Rabun, M.D., conducted an outpatient psychiatric evaluation

of Plaintiff, which included a review of her psychiatric records.  (Tr. 293-95)  Dr. Rabun

concluded that, although Plaintiff showed symptoms of depression, she provided a "mixed

picture."  (Tr. 295)  Plaintiff was often able to "completely focus, concentrate and interact

appropriately, despite showing tears running down her cheeks."  (Id.)  Dr. Rabun did not observe

significant evidence of PTSD, and concluded that she did not have symptoms consistent with the

level of major depression.  (Id.)  Dr. Rabun found that Plaintiff would have "mild limitations" in

her ability "to interact appropriately in a social setting and adapt to changes in a work

environment," but that she also could "focus, concentrate, and remember instructions."  (Id.)

### 4.     Dr. Salamat[3]

Plaintiff was seen several times in 2011 by a provider identified in the record as Dr.

Salamat.  On August 26, 2011, Dr. Salamat completed an "Adult Psychiatric Evaluation" of

Plaintiff.  (Tr. 367-70)  Plaintiff reported that, upon losing Medicaid, she was unable to obtain

certain medications and started feeling sad and constantly tearful, and experienced frequent

---

[3] Dr. Salamat's full name is not clearly identified in the record.  It appears that Dr. Salamat was a resident physician.  (Tr. 365)  Plaintiff indicates that Dr. Salamat was affiliated with Jewish Family and Children's Services.  (ECF No. 16 at 3; Tr. 46)

nightmares and flashbacks.  (Tr. 367)  Plaintiff reported a 2002 suicide attempt that involved intentionally crashing her car, but that she did not follow through on it.  (Id.)  Dr. Salamat diagnosed Plaintiff with "MDD with psychosis? and R/O PTSD."[4]  (Tr. 369)  Dr. Salamat noted that, although Plaintiff denied tobacco use, she smelled of tobacco.  (Tr. 370)

Dr. Salamat conducted follow-up visits with Plaintiff on September 9, October 7, and November 11, 2011.  (Tr. 363-66)  The treatment notes indicate that, in her November 11, 2011 session, Plaintiff described her mood as "better" and Dr. Salamat observed she was not tearful for the first time, and was smiling "but still looked depressed."  (Tr. 363)

On January 13, 2012, Dr. Salamat completed a Mental Medical Source Statement ("MMSS") at the request of Plaintiff's lawyer.  (Tr. 299-302)  The MMSS was completed in a checklist format, with no accompanying notes or explanations.  With respect to activities of daily living, Dr. Salamat rated Plaintiff to have moderate limitations in her abilities to function independently, maintain reliability, and adhere to basic standards of neatness/cleanliness; and marked limitations in her abilities to cope with normal stress and behave in an emotionally stable manner.  (Tr. 299)  Regarding Social functioning, Dr. Salamat found Plaintiff to have a moderate limitation in her ability relate to family, peers, and caregivers, and an extreme limitation relative to her ability to interact with strangers or the general public.  Dr. Salamat found no limitations relating to Plaintiff's abilities to accept instructions or respond to criticism, ask simple questions or request assistance, or maintain socially acceptable behavior.  (Tr. 300)  Regarding concentration, persistence or pace, Dr. Salamat opined that Plaintiff had moderate issues in her ability to make simple and rational decisions.  Dr. Salamat also opined that Plaintiff had marked limitations relative to her ability to perform at a consistent pace without an unreasonable number

---

[4] Based on context, the Court believes Dr. Salamat's diagnosis was moderate depressive disorder with possible psychosis, and rule out PTSD.

and length of breaks, and to respond to changes in her work setting. Dr. Salamat found no limitations relative to Plaintiff's ability to maintain attention and concentration for extended periods, and to sustain an ordinary routine without special supervision. (Id.) Dr. Salamat also opined that Plaintiff would not be able to interact appropriately with coworkers, supervisors, or the general public. (Tr. 301) Dr. Salamat found that Plaintiff's psychological symptoms would cause her to miss work and be late for work three or more times per month. (Tr. 301-02) Dr. Salamat assessed Plaintiff's disability onset date as 2002. (Tr. 302)

### 5. Dr. Vaishali Shah, M.D. – Barnes-Jewish Hospital

The administrative record indicates that, between January and June 2012, Plaintiff was seen several times by Dr. Vaishali Shah, M.D., at the Barnes-Jewish Hospital Psychiatry Clinic. (Tr. 308-35) During an initial assessment on January 18, 2012, Dr. Shah noted that, although Plaintiff was reliable, she was not a "very accurate historian." (Tr. 328) In that initial visit, Dr. Shah diagnosed Plaintiff with depression (not otherwise specified) and anxiety (not otherwise specified), as well as with a personality disorder (not otherwise specified). Dr. Shah noted that the diagnoses would be clarified upon more opportunities to speak with Plaintiff. (Tr. 330) Dr. Shah's notes also indicate that Plaintiff attempted suicide in 2005 by intentionally falling down in the street. (Tr. 238)

Dr. Shah treated Plaintiff again for psychotherapy and medication management on February 21, 2012. (Tr. 321) Dr. Shah repeated his assessment regarding depression, anxiety, and personality disorder.

Dr. Shah's notes indicate that Plaintiff had been conducting her own medical research. For example, Plaintiff advised she was resistant to changing to a particular medication because it can cause palpitations. (Tr. 323) Dr. Shah commented that Plaintiff should not diagnose serious

medical conditions by reading text books. (Tr. 324)[5]

Dr. Shah saw Plaintiff for psychotherapy and medication management on March 27, 2012. Dr. Shah repeated his earlier assessment regarding Plaintiff's depression, anxiety, and personality disorder. (Tr. 318) Dr. Shah modified Plaintiff's medication.

On June 20, 2012, Dr. Shah saw Plaintiff again for psychotherapy and medication management. Plaintiff reported an improved mood but trouble with "interpersonal aggression," which "did not appear to be in the context of psychosis." (Tr. 310) At this point, Dr. Shah modified his assessment. Dr. Shah diagnosed Plaintiff with major depressive disorder (moderate, recurrent), PTSD (chronic), and a personality disorder (not otherwise specified). (Tr. 310)

### 6.    Dr. Keith Wood, M.D. – Barnes-Jewish Hospital

Between July 2012, and September 2012, Plaintiff was seen at Barnes-Jewish Hospital by Dr. Keith Wood, M.D. The records indicate that the visits were for psychotherapy and medication management. (Tr. 371-408)

On July 31, 2012, Dr. Wood completed a psychiatric intake assessment of Plaintiff. (Tr. 402-08) Dr. Wood's initial assessment included diagnoses of mood disorder (not otherwise specified), PTSD (chronic), nicotine dependence, and a history of personality disorder (not otherwise specified). (Tr. 402) Plaintiff explained that she was able to function until the traumatic event in 2002 when she said she was beaten by co-workers. (Tr. 403) In this account of the event, Plaintiff claimed that she was pregnant and the fetus came out, but "it appeared to be 'an egg, instead of a baby.'" (Id.) Plaintiff advised that she continued to work for the same

---

[5]  Dr. Shah's notes quote Plaintiff as indicating a belief that her daughter's boyfriend had pancreatic cancer because "doctors could not find gallstones, which are present in 85% cases of pancreatitis." (Tr. 324)

employer for another two years before her symptoms of depression and anxiety rendered her unable to work. (Id.) Plaintiff advised Dr. Wood that she attempted suicide twice. She recounted how, in 2005, she laid in the street as though she had fallen in traffic. (Tr. 403-04) Plaintiff also claimed that, in 2008, she took a Percocet, knowing that she was allergic to the medication. Plaintiff was not injured as a result of either alleged suicide attempt. (Tr. 404) Dr. Wood noted that he was "concerned about [Plaintiff's] connection with reality, given the oddness of her current behaviors and [the] bizarre character of her stories."[6] (Tr. 406)

Dr. Wood saw Plaintiff on August 16, 2012, for psychotherapy and medication management. (Tr. 394) Plaintiff reported an anxious but stable mood, with normal sleep, appetite, energy and concentration. Plaintiff was engaged in recreational activities. (Id.) Plaintiff reported that upon watching the movie "Signs," she felt God was speaking to her and telling her to be more religious. Plaintiff asked whether she might have symptoms of schizophrenia, but she was reluctant to take antipsychotics because they "killed [her] sex drive." (Id.) Dr. Wood diagnosed Plaintiff with psychosis (not otherwise specified), PTSD (chronic, provisional), and nicotine dependence. (Tr. 395) Dr. Wood's assessment of Plaintiff's condition on August 27, 2012, was largely consistent with the notes form the August 16th visit.

After a visit on September 4, 2012, Dr. Wood modified his diagnosis to schizophrenia, undifferentiated type (provisional) and nicotine dependence. (Tr. 383) Dr. Wood did not include any diagnosis of PTSD. On September 17, 2012, Dr. Wood added a diagnosis of depression (not otherwise specified). (Tr. 376)

---

[6] In this regard, Dr. Wood referred to Plaintiff's description of her attack in 2002 as "excessively bizarre and nonsensical in terms of the events." In particular, Dr. Wood referenced the lack of police involvement, the fact that the patient continued to work at [the] facility and the odd explanation of her losing a fetus and stating that it was 'an egg.'" (Tr. 406)

B.    **Physical Treatment and Evaluations**

 A substantial physical health issue before the Court involves Plaintiff's eye and vision health.  The administrative record indicates a history of Graves' Disease, which resulted in eye and vision related medical issues.  For example, in August 2008, Plaintiff was admitted to DePaul Health Center for "thyrotoxicosis w/ storm" and "colitis."[7]  (Tr. 337)

Between September 2009 and May 2012, Plaintiff was seen several times by physicians at Barnes-Jewish Hospital relative to her Graves' Disease and thyroid issues.  (Tr. 255-71, 353-61)  These physicians included Dr. Amy Riek, M.D., Dr. James Heins, M.D., Dr. David Rome, M.D., Dr. Annie Haase, M.D., Dr. William Clutter, M.D., and Dr. David Rometo, M.D.  Regarding Plaintiff's eye issues associated with Graves' Disease, the physicians encouraged Plaintiff to see a specialist, Dr. Custer, and to quit smoking.[8]  (Tr. 256, 263, 271, 354, 360)

On December 30, 2009, Plaintiff was seen by Dr. Adam Buchanan, M.D., on referral from Dr. Riek.  (Tr. 346)  Plaintiff complained about double vision, "which occurs three-to-four times per day and lasts only for a few seconds."  (Id.)  Dr. Buchanan described this as "brief intermittent diplopia."  (Tr. 347)  The treatment notes indicate Plaintiff's vision, with correction, as 20/50 and 20/60.  Dr. Buchanan also stressed to Plaintiff "the great importance of smoking cessation."  (Id.)   In a follow-up visit on February 24, 2010, Dr. Buchanan noted that Plaintiff still smoked and that her vision was tested at 20/40 and 20/50, with correction.  (Tr. 347, 350)

Between March 2010 and August 2010, Plaintiff was seen by the Washington University Eye Center and Dr. Philip Custer, M.D., relative to her thyroid eye disease.  Dr. Custer found Plaintiff to have persistent thyroid eye disease and noted that his findings were "relatively

---

[7]  The record from DePaul Hospital is sparse.  The Court notes that the record before the ALJ who rejected Plaintiff's prior applications for DIB and SSI indicates Plaintiff's urine tested positive for opiates and marijuana during her stay at DePaul.  (Tr. 70)
[8]  Plaintiff smoked a pack of cigarettes per day for thirty years.  (Tr. 270)

stable." (Tr. 303) Plaintiff's visual acuity was rated at 20/30 and 20/25. (Id.)

Dr. Steven Couch, M.D., treated Plaintiff on November 3, 2010. (Tr. 224-25) Dr. Couch examined Plaintiff relative to Graves' ophthalmopathy. Dr. Couch described Plaintiff's condition as "sable if not improved," and "doing quite well." (Tr. 224) Dr. Couch noted that Plaintiff's improvement over the prior year, stating that "she does occasionally have binocular oblique diplopia, but this has significantly decreased since it started many years ago. She also has a decrease in pain, redness, irritation, and tearing." (Id.) Plaintiff's vision with correction was assessed at 20/40 (right) and 20/50 (left). (Id.)

On June 6, 2011, Dr. Raymond Leung, M.D. performed a consultative physical exam of Plaintiff. (Tr. 274-80) Although Plaintiff reported chest pains, with pain on a scale of 10 out of 10 during exertion, Dr. Leung found that she did not appear to be in distress and noted no cardiac issues. (Tr. 274-75) Dr. Leung's impression included Graves' Disease, but he did not note any other significant physical impairments.[9]

On June 21, 2011, Dr. John Jung, M.D., conducted a case analysis of Plaintiff. Dr. Jung noted Plaintiff's thyroid issue was treated with medication and had "good control." (Tr. 298) Plaintiff's double vision was occasional and significantly decreased and she had no noted optic neuropathy. Dr. Jung noted Plaintiff's Graves' Disease had been "very adequately treated and controlled." (Id.)

---

[9] For example, Dr. Leung concluded that Plaintiff exhibited a full range of motion in all of her joints, and that her pinch, arm, leg, and grip strength were all five out of five. (Tr. 276)

**IV.    The Hearing Before the ALJ**

The ALJ conducted a hearing on September 13, 2012.  Plaintiff was present with an attorney.  Also present was a vocational expert ("VE"), Brenda Young.  Both Plaintiff and the VE testified at the hearing.

**A.    Plaintiff's Testimony**

In response to questions from the ALJ, Plaintiff described her current living situation. Plaintiff explained that she did not socialize other than with her boyfriend, her daughter, and her daughter's boyfriend.  (Tr. 17-18)  Plaintiff described her thyroid storm issues, which began in August 2008.  Plaintiff claimed that, although everyone thought she was awake, she was really unconscious for eight days.  (Tr. 19)  Plaintiff admitted that she continued to smoke.  (Id.) Plaintiff also discussed some of her medications and side effects.  (Tr. 19-21)

Plaintiff's attorney also questioned her.  Plaintiff explained her mental problems, including her worries and fears, daily panic attacks, yelling incidents, and her reluctance to leave her house.  (Tr. 22-24)  Plaintiff testified that it takes her all day to clean her kitchen.  Plaintiff described that she watches television, but cannot concentrate.  (Tr. 26)  Plaintiff stated that she cannot read due to double vision, and that "by the time [she is] finished with half the sentence, [she has] lost the meaning of what came before."  (Id.)  Plaintiff claimed it took her three days to read a paper her lawyer had given her.  (Tr. 27)  Plaintiff also testified that she could not remember what happened from February 2004, until her thyroid storm in August 2008, and that she continues to have memory problems.  (Tr. 27-28)  Plaintiff described her energy as better than it had been.  (Tr. 28)

**B.    The VE's Testimony**

The VE, Brenda Young, testified without objection from Plaintiff's counsel.  The VE

acknowledged that she was present during Plaintiff's testimony. The VE also explained that her testimony was in reference to the St. Louis metropolitan area. The VE identified Plaintiff's past work as a licensed practical nurse ("LPN"), which was classified as medium, and semi-skilled, but that the work was sometimes performed at the heavy category. (Tr. 30-31)

The ALJ posed a series of hypothetical questions to the VE, with each question building upon the prior question by adding limitations/restrictions. In the first question, the ALJ asked the VE to consider a hypothetical claimant, having the same age, education and work experience as Plaintiff, limited to light work, and a further limitation of "simple instructions communicated verbally rather than in written form." (Tr. 31) The VE testified that such a claimant could not return to her past work as an LPN, but she could be employed as a "dining or cafeteria attendant" (DOT Code 311.677-010) or in "light janitorial work" (DOT Code 323.687-014). (Tr. 31-32)

For her second hypothetical question, the ALJ asked the VE to include an additional limitation of a "low stress environment, with low-stress defined as occasional decision-making and occasional changes in the work setting." (Tr. 32) The ALJ also asked the VE to include a limitation of only occasional judgment required, and only occasional interaction with the public, coworkers, and supervisors. (Id.) The VE testified that such a claimant would be capable of the same two jobs she described earlier – cafeteria attendant or light janitorial work.

As a third hypothetical, the ALJ asked the VE to include a limitation of "basically no interaction with the public." (Tr. 32) The VE testified that such a person would still be employable. (Tr. 33)

For her fourth and fifth hypotheticals, the ALJ asked the VE to consider a claimant would also be off-task twenty percent of the time or not present for twenty percent of the time. According to the VE, such a person would not be employable. (Id.)

The VE testified that her answers were consistent with the DOT.  (Id.)  Plaintiff's attorney did not question the VE.

## V.    **The ALJ's Decision**

In a decision dated November 16, 2012, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  (Tr. 35-55)  Consistent with the VE's testimony, the ALJ found that Plaintiff had the residual functional capacity to perform the requirements of occupations such as dining room attendant and light janitorial.  (Tr. 54)

In arriving at her decision, the ALJ followed the required five-step inquiry.  The ALJ determined that Plaintiff had the severe impairments of "Graves' Disease, colitis, post-traumatic stress disorder/anxiety, and depression, and a "non-severe impairment of occasional double vision."  (Tr. 40)  The ALJ further determined that, despite her impairments, Plaintiff retained the residual functional capacity ("RFC") to perform "light work"[10] with the following additional limitations/restrictions:  (1) plaintiff "requires a job that allows simple verbal instructions rather than written instructions;" (2) plaintiff "is capable of low stress work (with 'low stress' defined as occasional decision-making and occasional changes in work setting);" (3) plaintiff "is able to exercise occasional work-related judgment;" and (4) plaintiff can "occasionally interact[] with co-workers and supervisors, and … engage in occasional to no interaction with the public."  (Tr.

---

[10]    Light work as defined in the Commissioner's regulations:

involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work . . . .

20 C.F.R. § 404.1567(b).

41-42)

The ALJ supported her RFC determination with a thorough analysis of the record evidence. (Tr. 42-53) The ALJ considered Plaintiff's subjective allegations regarding her symptoms and limitations, but found her not credible. (Tr. 43, 50) The ALJ thoroughly considered the record evidence regarding Plaintiff's exertional and non-exertional limitations, including her mental health problems. As noted above, one of the persons providing mental health treatment to Plaintiff was Dr. Salamat. In support of her application, Plaintiff submitted the MMSS prepared by Dr. Salamat that included numerous marked and some extreme limitations. The ALJ gave Dr. Salamat's opinions little weight. (Tr. 47-48) In so doing, the ALJ explained that Dr. Salamat's opinions suggested "institutional level disability." (Tr. 47) The ALJ further explained how, in the ALJ's opinion, Dr. Salamat's opinions were internally inconsistent, inconsistent with other medical evidence in the record as a whole, and inconsistent with his own treatment notes. (Id.) The ALJ also observed that Plaintiff was "less than credible" and had been deceptive with Dr. Salamat. (Tr. 47-48) For example, Plaintiff denied smoking but Dr. Salamat reported that she smelled of smoke. (Tr. 47) For these reasons, the ALJ gave Dr. Salamat's opinions little weight.

After examining the medical evidence, the ALJ explained that, other than Dr. Salamat, no other treating physician "ever found or imposed any long term, significant and adverse mental or functional limitations upon [Plaintiff's] functional capacity." (Tr. 49) Similarly, there was no medical evidence indicating that Plaintiff required surgery or prolonged hospitalization for any of her conditions after her alleged onset date. (Id.) Moreover, the ALJ relied on the fact that Plaintiff had a documented history of non-compliance with respect to smoking and its impact upon her Graves' Disease. (Tr. 50)

The ALJ concluded that, although Plaintiff could not return to her past relevant work as a nurse, she could perform other jobs that exist in substantial numbers in the state and national economies. (Tr. 53-54) In making her determinations, the ALJ relied on the testimony of the VE. The ALJ concluded that Plaintiff had the ability to perform the requirements of at least two representative jobs – dining room attendant and light janitorial work. Accordingly, the ALJ concluded that Plaintiff was not under a disability under the Act. (Tr. 54)

The ALJ's decision is discussed in greater detail below in the context of the issues Plaintiff has raised in this matter.

## VI.    Standard of Review and Legal Framework

"To be eligible for SSI benefits, [Plaintiff] must prove that she is disabled …." Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); see also Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A plaintiff will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled…. The ALJ consider[s] whether:  (1) the claimant was employed; (2) she was severely impaired; (3) her

impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)). See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id. Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1.  The credibility findings made by the ALJ.
2.  The claimant's vocational factors.
3.  The medical evidence from treating and consulting physicians.
4.  The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5.  Any corroboration by third parties of the claimant's impairments.
6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

VII.   **Analysis of Issues Presented**

In her initial brief, Plaintiff raises three issues, which all challenge the ALJ's RFC determination. In her reply brief, Plaintiff also questions the ALJ's step five determination that Plaintiff retains the RFC to work as a dining/cafeteria attendant or janitor in view of an alleged conflict between Plaintiff's RFC, as stated by the ALJ, and the requirements for those jobs. As noted below, the Court concludes that the ALJ did not err in assessing Plaintiff's RFC. Although the ALJ arguably erred in relying on the VE's testimony relative to the dining/cafeteria position, remand is not necessary because there was no such error regarding the VE's testimony involving Plaintiff's ability to perform work associated with a light janitorial position. The Court addresses each of Plaintiff's proffered issues below.

A.    **Substantial Evidence Supports the ALJ's RFC Determination**

Plaintiff first argues that the ALJ's RFC lacks a substantial basis of support in the record. Specifically, Plaintiff contends that no medical opinion in the record supports the ALJ's RFC

finding in that it contains unsupported limitations and lacks limitations that reflect the severe impairments found by the ALJ. Plaintiff also contends that the RFC is flawed because the ALJ failed to properly weigh the opinions of Drs. Salamat and Aram. Finally, Plaintiff asserts that the ALJ failed to adequately consider her chronic mental illness.[11] The Court disagrees.

### 1. The ALJ's Adverse Credibility Determination

The Court first addresses the ALJ's adverse credibility determination. Although Plaintiff has not raised a specific challenge in this regard, the evaluation of Plaintiff's credibility is necessary to a full consideration of the ALJ's RFC determination. See Wildman, 596 F.3d at 969 (explaining that an "ALJ's determination regarding [a claimant's] RFC was influenced by [the ALJ's] determination that [claimant's] allegations were not credible") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)). Moreover, the Eighth Circuit has instructed that, in the course of making an RFC determination, the ALJ is to consider the credibility of a plaintiff's subjective complaints in light of the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). See also 20 C.F.R. §§ 404.1529, 416.929. The factors identified in Polaski include: a plaintiff's daily activities; the location, duration, frequency, and intensity of his symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of her medication; treatment and measures other than medication she has received; and any other factors concerning her impairment-related limitations. See Polaski, 739 F.2d at 1322; 20 C.F.R. §§ 404.1529, 416.929. An ALJ is not, however, required to discuss each Polaski factor and how it relates to a plaintiff's credibility. See Partee v. Astrue, 638 F.3d at 860, 865 (8th Cir. 2011) (stating that "[t]he ALJ is not required to discuss methodically each Polaski

---

[11] Although Plaintiff did not couch her "chronic mental illness" argument specifically in terms of the ALJ's RFC analysis, it appears from context that Plaintiff is referring to her ability to function in a workplace. (ECF No. 16 at 14-15)

consideration, so long as he acknowledged and examined those considerations before

discounting a [plaintiff's] subjective complaints") (internal quotation and citation omitted);

Samons v. Astrue, 497 F.3d 813, 820 (8th Cir. 2007) (stating that "we have not required the

ALJ's decision to include a discussion of how every Polaski factor relates to the [plaintiff's]

credibility").

      This Court reviews the ALJ's credibility determination with deference and may not

substitute its own judgment for that of the ALJ.  See Gregg v. Barnhart, 354 F.3d 710, 713 (8th

Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives

good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility

determination"); Pearsall, 274 F.3d at 1218.

      In this case, the ALJ concluded that Plaintiff was "not credible with regard to disabling

limitations of either a physical or mental nature."  (Tr. 50)  This determination is important in the

present case because, "Dr. Salamat, as a treating source, completed an opinion based primarily

on [Plaintiff's] subjective complaints."  (Id.)  The ALJ did not simply discount Plaintiff's

subjective complaints based on her own observations.  Rather, the ALJ's decision shows that she

carefully considered the record as a whole, including, but not limited to, Plaintiff's prior work

record, third party observations, treating and examining sources, as well as the dosage,

effectiveness and side effects of medications.  (Tr. 50-51)  The ALJ found that Plaintiff's

"medically determinable impairments could reasonably be expected to cause some of the alleged

symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting

effects of these symptoms are not credible to the extent they are inconsistent with [the ALJ's

RFC] assessment."  (Tr. 51)

      The ALJ gave ample good reasons for her adverse credibility finding, and the Court is

satisfied that the ALJ properly considered Plaintiff's subjective complaints under the Polaski rubric. The ALJ expressly considered the requirements of Polaski and 20 C.F.R. §§ 404.1529, 416.929. (Tr. 51) The ALJ supported her adverse credibility determination with a review of numerous factors. For example, the ALJ noted that Plaintiff was not compliant with her treatment options. (Tr. 51) The record and the law support the ALJ in this regard. Plaintiff continued to smoke, despite being advised numerous times that she needed to quit in view of her Graves' Disease and eye conditions. (Tr. 256, 263, 271, 350, 354, 360) See Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001) (failure to follow prescribed course of treatment may be weighed against claimant's credibility when assessing subjective complaints). Likewise, the ALJ considered that Plaintiff was "reluctant to take antipsychotic medications due to potential interference with her sex drive." (Tr. 51) The ALJ also noted that Plaintiff provided arguably inconsistent information regarding the impact of antipsychotic medications. On the one hand, Plaintiff claimed she was unable to have sex due to being prescribed Remeron. On the other, after Plaintiff's Remeron dosage was increased she advised providers Barnes-Jewish Hospital that she thought she was pregnant. (Tr. 52, 353)

The record also supports the ALJ's finding that Plaintiff had not been candid with some of her own physicians. Although Plaintiff told Dr. Salamat that she did not smoke, Dr. Salamat noted that she smelled of tobacco. (Tr. 370) When Plaintiff first experienced her "thyroid storm" in August 2008, she denied drug use, but her urine tested positive for opiates and marijuana. (Tr. 52, 70, 74) Plaintiff told some of her providers of a prior suicide attempt in 2005, but denied the attempt to Dr. Rudersdorf. (Tr. 234)

Substantial evidence in the record also supports the ALJ's conclusions that that Plaintiff tended to exaggerate and embellish her situation, and was strongly motivated to obtain disability

benefits. See Ramirez v. Barnhart, 292 F.3d 576, 581 n.4 (8th Cir. 2002) (explaining that, while not dispositive itself, the ALJ may properly consider a claimant's financial motivations in making a credibility determination). For example, Plaintiff complained to Dr. Rudersdorf that her prior doctor "screwed" her out of her chance to obtain benefits, and asked Dr. Rudersdorf when he could fill out her disability paperwork. (Tr. 234, 237) While Plaintiff testified regarding her difficulties reading (due to double vision), the record showed she was able to conduct her own medical research. (Tr. 52) Furthermore, the medical evidence indicated that Plaintiff's double vision was limited in terms of both frequency and duration, and had improved over time.[12] In fact, in her own disability report, Plaintiff acknowledged that she could read and understand English. (Tr. 170)

In reviewing the record in this case, therefore, the Court is fully satisfied that the ALJ complied with the standards outlined in Polaski and did not err in finding Plaintiff not credible.

## 2. The ALJ's RFC Determination

Plaintiff contends that the ALJ's RFC finding lacks a substantial basis in the record and is incomplete. In this regard, Plaintiff argues that the ALJ's RFC "does not correspond with any medical opinion in the record," and that the ALJ "failed to build a bridge between the evidence and the RFC finding." (ECF No. 16 at 10, 12) The Court concludes that substantial evidence supports the ALJ's RFC determination in this case.

---

[12] As noted above, Dr. Couch's treatment notes described Plaintiff's eye problems as improving in 2010, stating that "she does occasionally have binocular oblique diplopia, but this has significantly decreased since it started many years ago. She also has a decrease in pain, redness, irritation, and tearing." (Tr. 224) In 2009, Plaintiff described her double vision to Dr. Buchanan as occurring three or four times per day, and lasting for a few seconds. (Tr. 346) Dr. Buchanan described Plaintiff's condition as brief and intermittent. (Tr. 347) Stated differently, Plaintiff's double vision was of only limited duration in 2009 and had improved further by 2010. There is no notable record of any treatment for Plaintiff's alleged eye problems after 2010. Dr. Jung's case analysis in 2011 reported that Plaintiff's Graves' Disease was "very adequately treated and controlled." (Tr. 298)

A claimant's RFC is the most that claimant can do despite their limitations. 20 C.F.R. § 404.1545(a)(1). In determining a claimant's RFC, the ALJ should consider "all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (internal quotations omitted). While the RFC determination occurs at step four, where Plaintiff has the burden of proof, the Eighth Circuit has explained that the ALJ has primary responsibility for determining the RFC. Id.

As an initial matter, to the extent Plaintiff's argument suggests an ALJ's RFC must correspond to one of the medical opinions in the record, her argument is incorrect. See Martise, 641 F.3d at 927 (explaining that ALJ's are not required to "rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians") (internal quotations omitted). In any event, the record indicates that the ALJ conducted a thorough and searching review of the record in making her RFC determination. See id. The ALJ considered Plaintiff's own function report, a third party function report submitted by Plaintiff's daughter, Plaintiff's testimony, and an exhaustive review of the medical evidence. (Tr. 42-43, 44-47) As noted above, in conducting her RFC analysis, the ALJ gave detailed consideration to Plaintiff's credibility.

Despite the ALJ's thorough consideration, the Court will briefly review each of the ALJ's RFC determinations. The ALJ concluded that Plaintiff retained the RFC for light work, with the following additional limitations/restrictions: (1) plaintiff "requires a job that allows simple verbal instructions rather than written instructions;" (2) plaintiff "is capable of low stress work (with 'low stress' defined as occasional decision-making and occasional changes in work setting);" (3) plaintiff "is able to exercise occasional work-related judgment;" and (4) plaintiff

can "occasionally interact[] with co-workers and supervisors, and … engage in occasional to no interaction with the public."  The Court does not read Plaintiff's arguments as taking issue with the conclusion that she would be limited to light work.

Regarding the verbal instruction limitation, the Court first notes that substantial evidence in the record suggests the ALJ would have been justified in omitting this limitation.  Plaintiff formerly worked as an LPN and completed several years of college.  There is no doubt that Plaintiff can read, write, and speak English.  While Plaintiff experienced significant vision and eye problems relative to her Graves' Disease and thyroid problems, the medical evidence (including treatment notes from Drs. Couch, Custer, and Buchanan) indicates that, as of the date of her alleged disability, her vision issues were treatable, mild, sporadic, of a limited duration, and had improved over time.  (Tr. 224, 346-47)  Moreover, Plaintiff herself acknowledged that she could read.  (Tr. 170)  Finally, Dr. Rabun concluded that Plaintiff could remember instructions.  (Tr. 295)  Accordingly, the ALJ cannot be found to have erred in including a verbal instruction limitation, and if there was any error, it was harmless to Plaintiff.  See Byes v. Astrue, 687 F.3d 913, 918 (8th Cir. 2012); Wiley v. Colvin, No. 4:14 CV 330 TIA, 2015 WL 1411943 (E.D. MO Mar. 26, 2015).

Ample record evidence also supports the ALJ's low stress work environment and occasional interaction limitations.  While Plaintiff's mental health diagnoses varied among the examining and treating physicians, Plaintiff's arguments do not take issue with the ALJ's conclusion that she suffers from the severe impairments of depression and PTSD/anxiety.  Plaintiff and her daughter both described Plaintiff's problems with anger management.  (Tr. 178-94, 195-03)  Dr. Rabun examined Plaintiff and concluded that she would only have mild limitations in her ability to interact appropriately in social settings, adapt to changes in the

workplace, and remember instructions. (Tr. 295) Therefore, there was record evidence, both medical and otherwise, to support the inclusion of a low stress work environment and limited interaction restrictions.

Finally, the record supports the ALJ's "occasional work-related judgment" limitation. All of Plaintiff's mental health issues were treated on an out-patient basis. (See, e.g., Tr. 241, 308-05, 371-408) Dr. Rabun examined Plaintiff after her alleged disability onset date and found that she was often able to "completely focus, concentrate and interact appropriately," despite her crying. (Tr. 295) Dr. Rabun also found that Plaintiff had mild limitations in her ability to adapt to changes in a work environment, and that she could also remember instructions. (Id.) Further, although the ALJ gave only little weight to Dr. Salamat's opinions, even Dr. Salamat found Plaintiff had no limitations regarding her abilities to: accept instructions or respond to criticism; ask simple questions or request assistance; and sustain an ordinary routine without special supervision. (Tr. 300) Likewise, Dr. Salamat found Plaintiff to be only moderately limited in her ability to make simple and rational decisions. (Id.) Therefore, this Court cannot say that the record lacks support for the ALJ's conclusion that Plaintiff retained the ability to exercise occasional work-related judgment.

### 3.    The ALJ's Consideration of Medical Opinion Evidence

Plaintiff also argues that the ALJ erred in discounting Dr. Salamat's opinions, as reflected in his Mental Medical Source Statement ("MMSS"). Plaintiff contends that the ALJ failed to comply with Social Security regulations in weighing those opinions. (ECF No. 16 at 12-14) The Court disagrees with this characterization of the ALJ's decision.

In determining a claimant's RFC, an ALJ must at least consider her treating physician's opinion(s). Under the Commissioner's regulations, a treating physician's opinion is ordinarily

afforded controlling weight. <u>See</u> 20 C.F.R. § 404.1527. "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where the treating physician renders inconsistent opinions that undermine the credibility of such opinions." <u>Perkins v. Astrue</u>, 648 F.3d 892, 897-98 (8th Cir. 2011) (internal quotations omitted). Similarly, "[a]n ALJ may justifiably discount a treating physician's opinion when that opinion 'is inconsistent with the physician's clinical treatment notes.'" <u>Martise</u>, 641 F.3d at 925 (quoting <u>Davidson v. Astrue</u>, 578 F.3d 838, 843 (8th Cir. 2009)). Furthermore, "'[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements.'" <u>Wildman</u>, 596 F.3d at 964 (quoting <u>Piepgras v. Chater</u>, 76 F.3d 233, 236 (8th Cir. 1996)).

In this case, the ALJ's consideration of Dr. Salamat's MMSS was thorough and well-considered. First, the Court observes that Dr. Salamat's MMSS was completed in a checklist format, with virtually no supporting explanatory or clinical information. Dr. Salamat listed his diagnosis simply as "Axis I: MDD & psychotic features PTSD," with no further notes, comments, or explanation. (Tr. 302) The Eighth Circuit has explained that such checklist opinions, with little or no elaboration, have limited evidentiary value. <u>See</u> <u>Wildman</u>, 596 F.3d at 964 (citation omitted); <u>see also</u> <u>Johnson v. Astrue</u>, 628 F.3d 991, 994 (8th Cir. 2011).

Contrary to Plaintiff's characterization, the record clearly indicates that the ALJ considered the length and frequency of Dr. Salamat's treatment relationship. In this regard, it should be noted that the record shows that Dr. Salamat's treating relationship with Plaintiff was rather brief, with a few visits between August 2011 and November 2011, culminating in the MMSS which was dated January 13, 2012, and completed at the request of Plaintiff's lawyer.

The record also shows that Plaintiff switched physicians and returned to Barnes-Jewish Hospital for her psychiatric treatment after Dr. Salamat provided the MMSS. (Tr. 371-408) The record indicates that the ALJ referenced and considered all of Dr. Salamat's treatment notes and diagnoses, in addition to considering the opinions in Dr. Salamat's MMSS. (Tr. 46-48)

The ALJ also gave several specific and appropriate reasons for giving the opinions in Dr. Salamat's MMSS little weight. (Tr. 47-48) First, those opinions were internally inconsistent and inconsistent with his own treatment records. For example, without providing any explanation at all, Dr. Salamat opined that Plaintiff had extreme limitations in her ability to interact with strangers or the general public, but no limitation relative to her ability to maintain socially acceptable behavior. (Tr. 300) Similarly, Dr. Salamat opined that Plaintiff had marked limitations in her ability to perform at a consistent pace without an unreasonable number and length of breaks, and to respond to changes in the work setting. Dr. Salamat also opined that Plaintiff was capable of no more than two hours per day interacting appropriately with supervisors and applying a commonsense understanding to carry out simple instructions. Despite these severe restrictions, Dr. Salamat also opined that Plaintiff had no limitations in her abilities to maintain attention and concentration for extended periods or to sustain an ordinary routine without special supervision. (Tr. 300)

The ALJ also concluded that Dr. Salamat's opinions were in conflict with other medical sources and the record as a whole. In making this assessment, the ALJ extensively reviewed the examination notes of Drs. Shah and Wood. (Tr. 47-49) The ALJ also reviewed and considered the opinions and treatment notes of Drs. Rabun and Rudersdorf. (Tr. 45-46) This Court concludes that substantial evidence supports the ALJ's determination that Dr. Salamat's opinions conflicted with other substantial record evidence. See Johnson, 628 F.3d at 994.

The fact that the ALJ failed to mention the opinion of Dr. Aram is of no moment to the issues on appeal. See Wildman, 596 F.3d at 966 (explaining that a failure to cite specific evidence does not indicate that the ALJ failed to consider that evidence). In any event, Dr. Aram's opinions suggested very few limitations on Plaintiff's mental abilities. The Court can be confident that a recitation of Dr. Aram's opinion would have served to further confirm the ALJ's decision to discount Dr. Salamat's opinions.[13] See Byes, 687 F.3d at 917-18 (applying harmless error analysis to alleged mistakes by ALJ).

As discussed above, in discounting Dr. Salamat's opinions, the ALJ also considered Plaintiff's credibility and the fact that she had not been entirely truthful with Dr. Salamat. (Tr. 48-49, 50) Accordingly, the ALJ did not err in giving Dr. Salamat's vague and conclusory opinions little weight, nor did the ALJ err in relying on the opinions of other physicians, including Dr. Rabun. See Perkins, 648 F.3d at 897-98; Andrews v. Colvin, No. 14-3012, 2015 WL 4032122 at *4 (8th Cir. July 2, 2015); Wildman, 596 F.3d at 964. See also Buckner, 646 F.3d at 556 (a reviewing court does not reweigh the evidence and should disturb an ALJ's decision only if it falls outside "the available zone of choice").

**4.    Plaintiff's Chronic Mental Illness**

Plaintiff argues that the ALJ's evaluation of her functioning failed to appropriately consider her chronic mental illness. (ECF No. 16 at 14-15). The Court again must disagree with Plaintiff's characterization of the ALJ's decision. The record in this matter includes mental health treatment and examination records from numerous providers covering 2010 through 2012. The ALJ's decision expressly considered the records from virtually every treating and examining

---

[13] Dr. Aram found Plaintiff had only a mild limitation relative to maintaining social functioning, and no limitations relative to the activities of daily living and her ability to maintain concentration, persistence or pace. (Tr. 289) Dr. Aram found Plaintiff only partially credible. (Tr. 291)

physician, often in substantial detail. Thus, when viewed as a whole, the record makes clear that the ALJ was aware of and thoroughly considered Plaintiff's mental illness. See Wildman, 596 F.3d at 966. Furthermore, as the Commissioner correctly notes, many of the medical sources indicated that Plaintiff's mental health condition was not severe or had improved in numerous respects with treatment and medications. (ECF No. 20, Tr. 240, 293-95, 310, 363) Dr. Rabun found Plaintiff to have only a few mild limitations, and that she could focus, concentrate, and remember instructions. (Tr. 293-95) As explained above, the ALJ concluded that Plaintiff lacked credibility relative to the severity of her mental limitations. That conclusion is supported by substantial evidence. Finally, the Court notes that Plaintiff has not proffered how the ALJ's RFC should have been altered to adequately account for her mental health problems. Martise, 641 F.3d at 923 ("[While] [t]he ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC…. [T]he burden of persuasion to prove disability and demonstrate RFC remains on the claimant.") (internal quotations omitted).

Having considered the record evidence as a whole, the Court is satisfied that the ALJ adequately articulated Plaintiff's RFC, including a consideration of her mental impairments. Cf. England v. Astrue, 490 F.3d 1017, 1023 (8th Cir. 2007) (hypothetical questions need not frame a claimant's impairments in diagnostic terms, but can rest on the "concrete consequences of those impairments") (internal quotations omitted). Accordingly, Plaintiff's claim that the ALJ failed to appropriately consider her chronic mental health issues cannot be sustained on the basis of the record before this Court.

     **5.**    **Conclusion –Substantial Evidence Supports the ALJ's RFC Analysis**

For the foregoing reasons, the Court finds that the ALJ's RFC determination is supported

by substantial evidence on the record as a whole.  See Finch, 547 F.3d at 935.  Similarly, the Court cannot say that the ALJ's determinations in this regard fall outside the available "zone of choice," defined by the record in this case.  See Buckner, 646 F.3d at 556.

**B.      Potential Conflict regarding VE Testimony**

In her reply brief, Plaintiff arguably raised a new issue of a conflict between (1) the RFC limitations included in the hypothetical questions posed to the VE, and (2) the specific requirements for dining room attendants and light janitorial work, as delineated in the Dictionary of Occupational Titles ("DOT") and its companion volume, the Selected Characteristics of Occupations ("SCO").[14]  In particular, relying on Moore v. Colvin, 769 F.3d 987 (8th Cir. 2014), Plaintiff argues that the requirements for dining room attendant and light janitorial work both include an ability to read at 95-120 words per minute.  Plaintiff argues that this reading requirement creates an "apparent conflict" with the ALJ's RFC which restricted Plaintiff to simple verbal instructions.  The Commissioner, on the other hand, contends that a reading requirement is not the same as the verbal instruction limitation found in the RFC.  As explained below, the Court concludes that, on the present record, the reading requirement does not create the type of conflict at issue in Moore.

In Moore, the claimant's RFC limited him to only occasional overhead reaching bilaterally.  See Moore, 769 F.3d at 989.  The VE testified that such a claimant could perform janitorial or cafeteria attendant work.  Id.  The ALJ queried the VE if her testimony was consistent with the DOT, and the VE affirmed that it was consistent.  Id.  "However, the

---

[14] Plaintiff provided exhibits purporting to reflect the requirements of the DOT and SCO for the job listings the VE provided – 311.677-010 (cafeteria attendant) and 323.687-014 (cleaner, housekeeping).  (ECF Nos. 24-1 and 24-2)  In her response to Plaintiff's arguments, the Commissioner does not dispute the veracity or accuracy of Plaintiff's exhibits.  Accordingly, the Court relies on the exhibits in considering this matter.  For convenience, the Court will refer to each of these exhibits as "DOT No. _____."

*Selected Characteristics of Occupations* (SCO), a companion volume to the DOT, lists both of these jobs as requiring reaching '[f]requently,' meaning that it '[e]xists from 1/3 to 2/3 of the time.'" <u>Id.</u> (citing DOT # 311.677.010; DOT # 323.687-014). The Eighth Circuit found that there was an "'apparent unresolved conflict' between the VE testimony and the DOT," and the ALJ failed to elicit a sufficient explanation to resolve that conflict. <u>Id.</u> at 989-90 (citing SSR 00-4p, 2000 WL 1898704, at *204 (Dec. 4, 2000)). It was not sufficient in <u>Moore</u> to simply ask the VE if her testimony was consistent with the DOT. <u>Id.</u> at 990. As a result, the matter was remanded because "the Commissioner failed to meet her burden … [at] step five." <u>Id.</u>

The issue before this Court, therefore, is whether a general reading requirement in the DOT is sufficient to create an apparent, unresolved conflict with an RFC that limits Plaintiff to simple, oral instructions. The Court concludes that, in this case, the general reading requirement does not create an apparent unresolved conflict in this case. As explained below, however, the Court concludes that there is an "apparent conflict" between Plaintiff's RFC and other requirements for a cafeteria attendant, as outlined in DOT No. 311.677-010 (ECF Doc. 24-1), but no "apparent conflict" regarding the requirements for light janitorial, as outlined in DOT No. 323.687-014. Therefore, the present case is distinguishable from <u>Moore</u> and, therefore, the case need not be remanded because any error is harmless.

>    1.    **Cafeteria Attendant**

Although not raised directly by Plaintiff, the required reasoning skills for a cafeteria attendant include the ability to "[a]pply common sense understanding, to carry out detailed but uninvolved written oral (sic) instructions." DOT No. 311.677-010 (ECF No. 24-1 at 5). This requirement is in direct conflict with the ALJ's RFC assessment, upon which the VE relied, that limited Plaintiff to "simple verbal instructions." This DOT requirement would require Plaintiff

to handle detailed instructions, possibly in written form.  This is the sort of apparent conflict at issue in Moore that required remand.  Accordingly, absent further development of the record, substantial evidence would not support the ALJ's reliance on VE testimony that Plaintiff could perform work as a cafeteria attendant.

### 2.    Light Janitorial

Unlike the cafeteria attendant job, the light janitorial job identified by the VE does not include any written instruction requirement.  See DOT No. 323.687-014 (Cleaner, Housekeeping) (ECF No. 24-2).  The required reasoning skills for the light janitorial job require only the ability to "[a]pply common sense understanding, to carry out simple one-or two-step instructions."  Id. (ECF No. 24-2 at 3).

As Plaintiff correctly points out, the DOT includes a basic language skills requirement of the ability to read 95-102 words per minute.  Id. (ECF No. 24-2 at 4).  This reading requirement, however, does not present the same type of apparent conflict that was at issue in Moore.  In Moore, the apparent conflict directly corresponded to a specific RFC limitation, namely reaching.  The same is true for Kemp v. Colvin, 743 F.3d 630, 632-33 (8th Cir. 2014), upon which Moore relies for its apparent conflict analysis.[15]  In the present case, the alleged conflict does not directly correspond to a specific RFC limitation.  Stated differently, Moore and Kemp involved apparent actual conflicts between the RFC given to the VE and the DOT requirements relied upon.  The present case, however, involves an apparent possible conflict at best.  There was nothing obvious and even Plaintiff's counsel did not question the VE at all.  A contrary

---

[15]  Like Moore, the claimant in Kemp had a reach limitation (occasional overhead reaching only) but the VE opined that the claimant could perform work which the DOT required constant reaching.  See Kemp, 743 F.3d at 632-33.

conclusion would be largely unworkable at the administrative level.[16]  Furthermore, a contrary

conclusion would also tend to undermine the deferential standard of judicial review by

permitting disappointed claimants to scan the DOT/SCO for any possible conflict, however

small, and thereby short circuit the substantial deference normally accorded to the

Commissioner's disability determinations.

This conclusion is buttressed by a further review of the DOT entry in question.  The DOT

entry for the cleaner/housekeeping job lists "Not Present" for each vision requirement (near

acuity, far acuity, depth perception, accommodation, color vision, and field of vision).  Id. (ECF

No. 24-2 at 6).  Thus, the light janitorial job identified by the VE does not impose vision

requirements inconsistent with the ALJ's RFC determination.

Furthermore, substantial evidence in the record strongly supports a conclusion that

Plaintiff can read at least at a basic level.  In her own disability report, Plaintiff admitted she

could read and understand English.  (Tr. 170)  Similarly, Plaintiff's daughter stated that Plaintiff

watches television and movies every day.  (Tr. 199)  Plaintiff has a college education and past

work as a nurse.  The record showed that Plaintiff was able to conduct independent research into

fairly complicated medical conditions, such as pancreatitis and pancreatic cancer.  (Tr. 324)

Although Plaintiff claimed it took her a significant time to read information from her lawyer, the

ALJ did not credit Plaintiff on this issue, and substantial evidence supports the ALJ's decision in

this regard.  (Tr. 52)

---

[16]  In this regard, the Court notes the Seventh Circuit has interpreted the meaning of apparent
conflict somewhat literally.  In Overman v. Astrue, the Seventh Circuit explained that claimant's
counsel's failure to identify the relevant conflicts between the VE's testimony and the DOT, at
the time of the hearing, "is not without consequence.  [Claimant] now has to argue that the
conflicts were obvious enough that the ALJ should have picked up on them without any
assistance, for SSR 00-4p requires only that the ALJ investigate and resolve apparent conflicts
…."  Because Moore and Kemp both arguably involved obvious conflicts, even under the
Seventh Circuit's analysis, the matters would have required remand.

Important to the present analysis is the fact that the ALJ found Plaintiff's vision issues to be non-severe and substantial evidence supports that conclusion. As recounted above, the treatment notes from Drs. Couch and Buchanan indicate that Plaintiff's double vision was infrequent, of limited duration, and had been improving over time. (Tr. 224, 347) Further, Dr. Jung reported that Plaintiff's Graves' Disease had been adequately treated and controlled. (Tr. 298)

The Court concludes that, on this record, the inclusion of a basic reading requirement in the DOT for light janitorial work, does not create an unresolved conflict (apparent or otherwise) with an RFC determination that limits Plaintiff to simple verbal instructions.

The Court is mindful of the deferential standard of review applicable to this case. Where the evidence allows for "inconsistent conclusions" to be drawn, "the decision will be affirmed where the evidence as a whole supports either outcome." Baldwin v. Barnhart, 349 F.3d 549, 555 (8th Cir. 2003). This Court may not disturb the ALJ's decision unless it fell outside the available "zone of choice" defined by the evidence of record. Buckner, 646 F.3d at 556. Here, when viewed as a whole, the record supports the ALJ's conclusion that Plaintiff could perform light janitorial work. The ALJ properly discounted Plaintiff's subjective complaint that she could not read. Therefore, there was no apparent conflict between the VE's testimony and the DOT requirements for light janitorial work.

### 3.      Harmless Error

For the foregoing reasons, the Court concludes that the ALJ erred to the extent she relied upon the VE's testimony that Plaintiff could work as a cafeteria attendant because that job requires her to be able to carry out detailed, rather than simple, instructions, and possibly in written form. This error, however, is harmless because the ALJ did not err in relying on the

VE's testimony that Plaintiff could work in the light janitorial field, as described in DOT No. 323.687-014. See Byes, 687 F.3d at 917-18.

## VIII.    Conclusion

For the reasons set forth above, the Commissioner's decision denying benefits is affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this __12th__ day of August, 2015.